## WARE RIVER RAILROAD COMPANY *vs.* CHAUNCEY VIBBARD & others.

Upon motion after nonsuit in replevin for the return of the property, a large quantity of imported railway iron, and for damages for its detention, it appeared, by the officer's return, that he had replevied the iron and delivered it to the plaintiff, and, by an indorsement upon the writ, that the plaintiff had received it; but it also appeared that from the time of its importation by the defendant it had been in bond under the laws of the United States; that the plaintiff had never obtained actual possession, the warehouse receipt

and the custom-house delivery order, the possession of which the parties regarded as a necessary means for obtaining possession, and without which the warehouseman refused to deliver, being in the possession of the defendant, who refused to transfer them to the plaintiff. *Held*, that the defendant, having prevented the plaintiff's obtaining actual possession of the property, was not entitled to damages for its detention; and that, as there had never been an actual change of possession, an order for a return was unnecessary.

REPLEVIN of 4190 rails of railroad iron. The defendants were the members of the partnership of Vibbard, Foote & Co., and of the partnership of Jay Cooke & Co., all of the State of New York, and George L. Brastow and Gardner Prouty. Writ dated January 29, 1873. The officer returned upon the writ that he had taken possession of " the within named railroad iron," and appointed appraisers, who appraised it at the sum of $64,400 ; that he took from the plaintiff a bond to the defendants (which was in the usual form), and that he had replevied the property and delivered it to the plaintiff. Indorsed upon the writ by the plaintiff's attorney was the following receipt : " Middlesex, ss. March 29, 1873. Received of Luther L. Parker, deputy sheriff, the railroad iron replevied by force of this writ. Ware River Railroad Company by E. P. Nettleton, their attorney."

Vibbard, Foote & Co., Jay Cooke & Co., Brastow and Prouty, made separate answers ; the two former denying that they unlawfully took and detained the property of the plaintiff, and that the goods were the property of the plaintiff. The answers of Brastow and of Prouty denied each and every allegation of the plaintiff's writ, and in particular that they unlawfully, or without justifiable cause, took the goods of the plaintiff, or that they unlawfully detained them.

After the cause was at issue, on October 18, 1873, a suit in equity was begun by the same plaintiff against the same defendants, concerning the title and possession of the same property, *ante*, 447, and a final decree was entered therein October 12, 1874. Thereupon, October 27, 1874, the plaintiff became nonsuit in this suit. Vibbard, Foote & Co. and Jay Cooke & Co. thereupon filed a motion for judgment, and for an order of return, and for damages for the detention of the property. Brastow and Prouty were not parties to this motion.

At the hearing upon the motion in this court, before *Wells,* J., the defendants having read the writ and officer's return, the appraisal and the receipt for the property, the plaintiff was allowed to show the following facts, so far as they were competent, as bearing upon the question, whether the defendants were entitled to an order for a return and for damages.   The deputy sheriff having the writ in hand went upon the day of its date, with Mr. Nettleton, one of the plaintiff's attorneys, to Damon's Wharf, in Charlestown.   Mr. Nettleton saw Prouty and Brastow, and ordered the officer to serve the writ, the iron then lying upon the wharf.   The officer served the writ by appointing one Mullett, who was a clerk of Mr. Prouty, keeper for him.   He gave his deputation to Mullett, as keeper, but did not remove the iron. This deputation was held by Mullett until March 29, 1873, when, by Mr. Nettleton's order and in his presence, the deputation was withdrawn, Mr. Nettleton giving the receipt upon the back of the writ.   The deputy sheriff then paid the storage fees due upon the iron during the time Mullett had held the deputation ; and the other storage charges thereon, for which Prouty had a lien, due from October 1, 1872, up to the time of the replevin, were paid by the plaintiffs.   No one opposed the officer in his doings as above stated.   He did not see Vibbard, Foote & Co. or Jay Cooke & Co., but served his writ upon their attorney.

In April, 1873, the plaintiff sent railroad cars to the wharf to transport the iron to its road, for use thereon, having made a bargain with Prouty to load it upon the cars at a certain price per ton, Prouty saying he, as wharfinger, was willing to deliver under the replevin bond, but his relations to the United States required that the delivery order should first be surrendered.

The iron was imported from Cardiff, Wales, into Boston, in the bark Presto, about December 26, 1871, was entered at the custom-house, and, the duties not having been paid, was placed in bond, on Damon's Wharf, by Vibbard, Foote & Co.   December 21, 1872, Vibbard, Foote & Co. transferred it in bond to Jay Cooke & Co., to whom a warehouse receipt was issued.   Decem ber 23, 1872, Jay Cooke & Co. paid the duties on it, $11,069.10, and took a delivery order.  Jay Cooke & Co., for Jay Cooke,

McCulloch & Co., of London, held both these papers as security for advances made by the last mentioned firm for the purchase of the iron.

George L. Brastow, one of the defendants, testified that he was acting as United States storekeeper at Damon's Wharf, from the November preceding the service of the writ till the November following ; that the iron lay in substantially the same place on the wharf during the time he was there ; that he was there to protect the interests of the United States only ; that he had no control of Prouty, but that they had an office together ; that he had possession for the government all the time ; that he knew of the officer's being there, of the cars being sent by the plaintiff for the iron, and told those in charge not to draw the cars on to the wharf, as they were not ready to load the iron.   He said :  " There was no reason why I was not ready, except that I had not received the custom-house permit, which I have not seen to this day.   I never consented to hold the iron for any one but the government. I refused to let the iron go till I received the custom-house permit. I had no occasion to give any order to Prouty ; he does not act under my orders.   The course of business is to surrender property only on presentation of a proper custom-house permit, showing the duties to have been paid.   I did not know officially that the duties on the iron had been paid, but had heard so about the time legal proceedings were begun in this case.   This iron, or the greater part of it, lay on the wharf outside of the bonded limits. There is an understanding between the wharfinger and me ; if the custom-house permit is correct, it is announced by me to the wharfinger, and he is not at liberty to deliver the goods until I have assented.   The iron is still on Damon's Wharf, never having been removed."

The president of the plaintiff company, May 12, 1873, demanded the permit from Vibbard, Foote & Co., who referred him to Jay Cooke & Co., who were said to have possession of it, and Jay Cooke & Co. refused to deliver it.   In June, August and September, correspondence attended with no result ensued between the parties respecting the possession of the iron.

Mullett, employed by the officer, became keeper under the deputation, by the consent of Prouty, and did not know whether the iron was in bond or in possession of the government. The greater part or all of the iron remained without the bonded limits at the time of the service of the writ. It appeared that Foote, one of the defendants, after the service of the replevin writ, and before May 12, 1873, called on the president of the plaintiff company, in relation to getting the iron released, and was referred by the president to Mr. Chapin, one of the signers of the bond and a director in the road, and that he informed Chapin of the fact that the defendants could sell the iron, and stated offers he had received for it, and that the iron was likely to depreciate, and asked him that Vibbard, Foote & Co. might be allowed to sell it to the persons who had made offers, giving a bond to account therefor if the plaintiffs succeeded in the suit, but Chapin declined the proposition.

The president of the plaintiff company applied, May 12, 1873, to Foote to consent that the iron should be removed from Damon's Wharf to the Boston & Albany Railroad Company's yards, to save storage, and this was declined. Foote claimed that he could export the iron. The president claimed he could not do it. Foote testified that the reason why he declined the president's proposition to have the iron removed to the Boston & Albany Railroad yards was because the plaintiffs then could get possession of it, and he meant to resort to all legal means in his power to prevent them from getting possession ; that Vibbard, Foote & Co., or Jay Cooke & Co., never tried to get possession of the iron by presenting the custom-house permit and warehouse receipt themselves to Brastow and Prouty, but that he (Foote) believed they could have obtained possession of it at any time by presenting those documents.

The defendants, Vibbard, Foote & Co. or Jay Cooke & Co., never made any efforts to get the iron from Brastow or from Prouty.

The case was reserved by agreement of all parties, upon the above facts, the record of the suit in equity being made part of the case, for the consideration of the full court, the court to make

such order as to judgment and return and damages, or either, as might be proper.

*H. W. Paine & R. D. Smith*, for the defendants.

*F. W. Hurd & E. P. Nettleton*, for the plaintiff.

WELLS, J. Judgment for a return with damages for the taking is ordered in an action of replevin, only "if it appears upon the nonsuit of the plaintiff, or upon a trial or otherwise, that the defendant is entitled to a return of the goods." Gen. Sts. c. 143, § 13. The question whether the defendants are entitled to have such a judgment, is to be determined by the state of the facts relating to the possession and right of possession at the time of the hearing upon the motion therefor. *Simpson* v. *M'Farland*, 18 Pick. 427. *Whitwell* v. *Wells*, 24 Pick. 25. *Martin* v. *Bayley*, 1 Allen, 381. *Davis* v. *Harding*, 3 Allen, 302. *Leonard* v. *Whitney*, 109 Mass. 265, 268.

The return upon the writ, if conclusive, settles only the fact that the property was, at that time, taken from the defendants and delivered to the plaintiff. A general verdict for the defendants, or a nonsuit, where both the taking and the title, or right of possession, are put in issue, determines only the right of the plaintiff to maintain the action. There being two issues, each sufficient to defeat the action, if found for the defendants, the verdict or nonsuit does not inform the court which issue is found or admitted.

The present case, however, does not raise the question whether, in such a posture of the proceedings, a return should be ordered or refused. The record of the suit in equity between these parties, in relation to the same property, is made part of this case. That suit established that the general ownership had passed from the defendants who now claim a return, but that they retained a lien for the unpaid purchase money, and a legal right of possession. They are entitled, therefore, to the possession, as against the plaintiff ; and to a judgment for a return, if that is necessary to restore them to possession.

But upon the whole statement of the case we are satisfied that the defendants are substantially in possession already, by reason of transactions in regard to the property since the service of the

writ, so that they neither require nor are entitled to any order of the court to re-instate them.

Although the plaintiff cannot now deny that the property was taken, and delivered to and received by its attorney, as appears by the return and receipt therefor upon the writ, yet the actual disposition of it may be proved for the purpose of showing the character and effect of the subsequent dealings of the parties in relation to the possession and control of it. It appears that the iron remained, where it had been previously deposited by the direction of the defendants, in the custody of a warehouseman, and under the supervision of the defendant, Brastow, "acting as United States storekeeper." It is immaterial whether and how far their authority over it was affected by the fact that a part or the whole was outside of the "bonded limits;" or what control they may have had or exercised under any authority derived from the government of the United States. Both parties treated the custody as lawful, and one which neither could disregard. The defendants now moving for a return held the warehouse receipt, and also the permit, or order allowing the removal of the iron, which issued from the custom-house upon payment of the duties. It is unimportant whether that permit had expired, and whether the plaintiff might have removed the property by virtue of the replevin, without producing and surrendering the warehouse receipt and the permit or delivery order. Both parties regarded the matter otherwise; and acted upon the supposition that the possession of the receipt and permit so far controlled the possession of the property that the plaintiff could not remove it from the warehouse, and have actual possession and use of it, without the surrender of those papers.

On March 29, 1873, Mr. Nettleton, as attorney for the plaintiff, acknowledged the receipt of the property from the officer who served the writ, and his keeper was thereupon discharged. The dues for storage to that time were paid, and arrangements made for removal of the iron. The warehouseman was ready to deliver to the plaintiff, but "his relations to the United States required that the delivery order should first be surrendered." The storekeeper refused to let the iron go until he should receive "the

custom-house permit." Application was then made to these defendants for the papers required to secure the release of the iron from the custody of the warehouseman and United States storekeeper, without success. May 12, 1873, the president of the plaintiff corporation " demanded the permit from Vibbard, Foote & Co., who referred him to Jay Cooke & Co., who were said to have possession of it, and Jay Cooke & Co. refused to deliver the same." Afterwards an arrangement was made for Vibbard, Foote & Co. to retake the iron and sell it, giving bonds to account for the proceeds, or otherwise respond to the result of the suit; but they failed to give the bond. Subsequently negotiations were had for a new sale to the plaintiff, but without result.

It appears from the report that, at the time of the demand for the permit by the president of the plaintiff corporation, May 12, 1873, he applied to Foote, one of the firm of Vibbard, Foote & Co., " to consent that the iron should be removed " " to the Boston & Albany Railroad Company's yards, to save storage, and this was declined. Foote claimed that he could export the iron. The president claimed that he could not. Foote testified that the reason why he declined the president's proposition to have the iron removed to the Boston & Albany Railroad yards was because the plaintiffs then could get possession of it; and he meant to resort to all legal means in his power to prevent them from getting possession; that Vibbard, Foote & Co., or Jay Cooke & Co., never tried to get possession of the iron by presenting the custom-house permit and warehouse receipt themselves to Brastow and Prouty, but he (Foote) believed they could have obtained possession of it at any time by presenting those documents."

The control over the property thus asserted and maintained by these defendants, and yielded to by the plaintiff, is substantially a defeat or termination of that momentary and constructive possession with which the plaintiff was clothed by the service of the writ. Having been prevented, by these acts and refusals of the defendants, from taking full and actual possession of the property, and thus deprived of its use, the grounds for charging the plaintiff with " damages for the taking by the replevin," do not exist. An order for a return is not necessary to secure both the legal

and actual possession to those who had it before the writ was served, because there has been no other change of possession than a constructive one, and that having ceased, the original status remains unaffected by the writ.

In this view of the case it will be unnecessary to consider the special relations of Brastow and Prouty to the question of a return. All the defendants will have judgment for their costs. But the motion for an order of return is          *Refused.*